IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| Harrison Sorman, and Constance Sorman, his mother, | : | Civil Action |
| | : | |
| Plaintiffs | : | |
| v. | : | |
| | : | |
| HAVERFORD AREA SCHOOL DISTRICT, 50 East Eagle Road, Havertown, Pennsylvania 19083, | : | No. |
| | : | |
| Defendant | : | Jury Trial Demanded |

## COMPLAINT

### I.     Preliminary Statement

1.      This action is brought by Harrison Sorman ("Harrison"), an individual with disabilities, and his mother, Constance Sorman (collectively referred to as the "Plaintiffs" or the "Family"), against defendant Haverford Area School District (the "District"). Plaintiffs seek compensatory damages and reasonable attorneys' fees and costs under Section 504 of the Rehabilitation Act of 1973, 29 U.S.C. §§ 794 and 794(a) ("Section 504"); the Americans with Disabilities Act ("ADA"), 42 U.S.C. §§ 12131 et seq.; and under 42 U.S.C. § 1983. Plaintiffs also bring Pennsylvania state law tort claims based on supplemental jurisdiction pursuant to 28 U.S.C. § 1367(a).

### II.     Parties

2.      At all relevant times to this action, Harrison has resided in or around Havertown, Pennsylvania with his mother. On August 28, 2018, he was identified as a student eligible for services under Section 504. Harrison is diagnosed with Post-Concussive Syndrome, Generalized Anxiety Disorder, Social Anxiety Disorder, Post-Traumatic Stress Disorder ("PTSD"), Major Depressive Disorder, and Attention-Deficit Hyperactivity Disorder ("ADHD").

1

3.      Defendant Haverford Area School District is located at 50 East Eagle Road, Havertown, Pennsylvania 19083. During all times relevant to this complaint, the District was the recipient of several sources of federal funds.

**III.   Jurisdiction and Venue**

4.      This Court has original jurisdiction over this matter pursuant to 28 U.S.C. § 1331 because this case raises federal questions under Section 504, the ADA, and Section 1983. This Court has further jurisdiction over Plaintiffs' state law claims based on supplemental jurisdiction pursuant to 28 U.S.C. § 1367(a). The amount in controversy, exclusive of interest and costs, exceeds $75,000.

5.      All the Defendant's actions complained of herein have taken place within the jurisdiction of the United States District Court for the Eastern District of Pennsylvania. Venue is appropriate in this District pursuant to 28 U.S.C. § 1391.

**IV.   Additional Facts Supporting Liability**

6.      Harrison is a 20-year-old former student of the District. Harrison first enrolled in the District at the start of the 2016-2017 school year for his tenth-grade year.

7.      Despite having average intelligence, Harrison has experienced academic difficulties since elementary and middle school. He had trouble with organization, concentration, and focusing. He required extra time to complete tasks and assignments, and he needed tutoring while he was in and out of school. In 2013, Harrison was evaluated by a psychologist and diagnosed with ADHD, primarily inattentive subtype.

8.      In Harrison's junior year, 2017-2018, his disabilities became even more apparent. One teacher reported that Harrison was rarely motivated and often absent from class. A second reported Harrison appeared to be struggling academically and emotionally. After the sudden

death of his father in March 2018, he struggled even more, with what appeared to be depression, and his work ethic and motivation to attend school decreased. Unless a teacher was working with him one-on-one and/or frequently prompting him, he often put his head down, slept or did not engage in required activities. Harrison's areas of need were identified as attendance, motivation, work ethic, attention and focus, and emotional coping skills.

9.      Due to his history of ADHD, plus concerns over his grades and his social/emotional functioning, the District evaluated him and, on August 28, 2018, issued an Evaluation Report ("ER") that found him eligible for a Section 504 Service Agreement to provide accommodations in the classroom to assist him with his needs. These accommodations included preferential seating; allowance for movement breaks throughout the day; extended time on tests and projects; frequent check-ins for attention and focus; meetings with teachers to assure that he was keeping up with classroom demands; and check-ins with his guidance counselor on a regular/scheduled basis.

10.     During his senior year, Harrison participated in online school and the District's "Twilight" program. The Twilight program is an academic support program for students identified as being at risk for not graduating.

11.     In November 2018, a peer of Harrison's in the Twilight program ("Student 1") made explicit threats against Harrison on social media. Harrison's girlfriend reported these threats to the high school principal. However, the District took no action.

12.     On February 5, 2019, Harrison reported to one of his teachers that he feared Student 1 was out to get him and that he was nervous about being in class with him. The same day, Harrison's counselor sent an email to two teachers in the Twilight program, making them aware of Harrison's concerns. Shortly after receiving the email, one of these teachers forwarded

3

the counselor's email to the Twilight coordinator, stating the correspondence seemed like something he should see as well.

13.     The next day, the teacher emailed the Twilight coordinator again, asking if some sort of protocol should be in place for the two students, should there be an issue. The teacher mentioned speaking about it with the coordinator the previous day. The coordinator then forwarded Harrison's counselor's email to the principal, proposing a protocol for how teachers should react if a situation of conflict between two or more students were to arise. The protocol specified that each student in conflict would be marked late. If there were two, one would be asked to report to the office, while the second would remain in the classroom, as the teacher would contact the principal. The principal would handle the student in the office and inform the teacher how and when to release the second student from his or her classroom. If there were three or more students involved, the same plan would be followed by attempting to send the most aggressive student to the office. The coordinator then emailed the two teachers, advising that he was looking into a plan for handling Harrison and Student 1, and that they should not tolerate any trouble. He advised at the first sign of any conflict, they should send one student out and phone the office or the cell phone of an administrator. The coordinator soon sent another email to the teachers, instructing them to make sure Harrison and Student 1 would not be seated next to each other, and to ensure that the teachers fill their class time with activities. He asked for any other suggestions on how to be "reactive" to this situation. The coordinator informed the principal that he believed an administrator should speak with Harrison and Student 1 immediately. He advised he had informed Harrison's teachers not to tolerate any conflict, and if there were to be any sign of such, to ask one of the students to leave. The principal responded

4

that the coordinator's proposal was acceptable, and that the students in such a situation should be sent home on a staggered schedule.

14.    During approximately the week of March 11, 2019, Student 1 made explicit threats to attack H.S. in class while the teacher was present.

15.    On March 19, 2019, Harrison entered his Twilight classroom and sat down in his seat. He arrived approximately five to ten minutes before class was scheduled to start, so he put his head down on his desk waiting for class to start. Student 1 then entered the room, walked past Harrison, approached Harrison from behind, and attacked him viciously and by stealth. Student 1 repeatedly punched Harrison in the head, both on top of his head and on the sides of his face. He spilled Harrison's drink and broke Harrison's prescription glasses. Then he left the room.

16.    No teacher or other District personnel was in the room at the time of the attack, though they arrived shortly thereafter and pulled H.S. into a different classroom.

17.    The District did not provide Harrison with medical attention despite his obvious injuries.

18.    The District did not call Harrison's mother to inform her that her son had been attacked. Instead, Harrison himself called his sister, who informed his mother. Harrison's mother immediately called the District; however, no one answered or returned her call.

19.    Harrison's sister rushed to the school and picked Harrison up from the office. She took him to the emergency room because was unable to speak and was clearly nauseated.

20.    At the hospital, following a computed tomography ("CT") scan, doctors diagnosed Harrison with and treated him for a concussion, multiple contusions, and a broken right maxillary bone. Although he followed their medical advice, as well as that of subsequent specialists, to the best of his ability, his symptoms have lingered.

21.     As a result of the concussion, Harrison felt dazed, confused, and disoriented, and this has continued despite extensive and long-term therapies. He experienced, and continues to experience, headaches, dizziness, blurred vision, ringing in his ears, a bad taste in his mouth, changes in his ability to smell, sensitivity to light and sound, memory and concentration problems, mood changes and mood swings, and feelings of depression and anxiety. Harrison began to fear and avoid participating in small groups, as well as working and writing while being observed, due to anxiety about his symptoms. He has had, and continues to have, repeated distressing memories and dreams about the assault, intense physical and emotional distress when exposed to things that remind him of the assault, diminished interest in previously significant activities of his life, feeling distant and as if his future will be cut short, trouble falling and staying asleep, irritability and outbursts of anger, problems concentrating, and feelings of depression and worthlessness.

22.     Approximately one month after the assault, Harrison's primary care physician referred him to multiple specialists, including a neurologist and an otolaryngologist to address the ringing in his ears that he had been experiencing ever since.

23.     Beginning approximately two months after the assault, Harrison received follow-up care from HAN Neurological Associates ("HAN"). The doctors at HAN recommended that Harrison begin receiving services from a specialized concussion clinic to help alleviate his symptoms, which Harrison did. HAN recommended speech, hearing, and occupational therapy supports and services to address Harrison's increased difficulty with concentration, memory, and visual perception.

24.     Shortly thereafter, a speech-language pathologist performed a Post-Concussion Evaluation of Harrison and found he had mildly impaired cognitive-linguistic skills. Harrison

6

was still experiencing multiple symptoms, including headaches, ringing in his ears, blurred vision, sleep disturbance, attention problems/difficulty concentrating, and memory problems. He was also regularly losing his train of thought while talking. The speech-language pathologist recommended Harrison receive speech therapy one time per week for eight weeks to improve his cognitive linguistic functioning. She also recommended therapy to develop and train Harrison in compensatory strategies to help him function more efficiently while optimizing his ability to participate in school and daily tasks.

25.    Dr. JoAnn Curcio Cohen, a licensed psychologist with over 30 years of experience treating individuals for learning problems, attention problems, and psychological disorders, conducted a comprehensive neuropsychological evaluation of Harrison over seventeen testing sessions between May and November of 2019, to accommodate Harrison's diminished tolerance for longer periods of testing. Dr. Cohen's evaluation included a thorough review of Harrison's history and present levels of functioning through multiple, standards-based assessments. Dr. Cohen found Harrison had average intelligence, but his cognitive and achievement scores had declined since his August 2018 ER by the District.[1]

---

[1] Specifically, in the August 2018 ER, Harrison scored in the Above-Average range, with a composite score of 117, on the Working Memory subtest of the Wechsler Adult Intelligence Scale, Fourth Edition ("WAIS-IV"). When Dr. Cohen re-administered the same test, his Working Memory index score had decreased by 25 points, to a composite score of 92. On the Wide Range Assessment of Memory and Learning, Second Edition ("WRAML-2"), Dr. Cohen found Harrison's overall memory functioning was at levels slightly below his same-aged peers, with particular deficits in tasks requiring verbal and visual memory skills, and across tasks that require both of those and that are also dependent on contextualized memory.

On the Luria-Nebraska Neuropsychological Battery ("LNNB"), Dr. Cohen found that Harrison scored in the clinically significant (low) range on Arithmetic and Intellectual Processes, while the District's August 2018 ER found Harrison had average achievement in mathematics. Harrison's later performance on the LNNB indicated difficulty with written and oral identification of several numbers, as well as difficulty with ability to recognize and appreciate numerical values in order to perform arithmetic operations.

26.     Dr. Cohen ultimately concluded Harrison met the criteria for Post-Concussive Syndrome, Generalized Anxiety Disorder, Social Anxiety Disorder, PTSD, Major Depressive Disorder, and ADHD. She concluded these diagnoses were either caused or exacerbated by the March 19, 2019 assault at school. She recommended further neurological testing to diagnose other aspects of his assault and head injury. She recommended that Harrison continue treatment, and continue to learn different techniques, to deal with the physical, emotional, and psychological consequences of the assault. She also recommended therapy to improve balance and vestibular function, ameliorate headaches, improve social functioning, and deal with significant emotional problems. She advised Harrison to consider rehabilitation at a brain center that specializes in Traumatic Brain Injuries ("TBI"). Dr. Cohen warned that it is likely that his injury from the assault could result in permanent limitations that could affect his ability to obtain gainful employment and earn an income, and that any improvement in memory or functioning that could assist Harrison should be explored.

27.     The District's actions and inactions were deliberately indifferent and/or reckless and created an unsafe and even hostile educational environment. Despite unmistakable knowledge of Harrison's need for close supervision, and the likelihood that he would be harmed

---

Harrison's performance on the Intellectual Processes scale indicated struggles in ability to analyze a subject, identify essential elements, and synthesize elements to elicit the underlying theme of a picture or story. His performance on the LNNB was consistent with that of individuals with injury to the prefrontal, frontal and/or medial regions of the cerebral hemispheres. On the Taylor Manifest Anxiety Scale ("TMAS"), Beck Anxiety Inventory ("BAI"), and Leibowitz Social Anxiety Scale ("LSAS"), Harrison's scores indicated clinically significant anxiety. Harrison also met the criteria for PTSD. On the Beck Depression Inventory, Second Edition ("BDI-II") and Mood Disorder Questionnaire ("MDO"), Harrison scored in the clinically significant range. On the Grit Scale, which measures perseverance and passion for long-term goals, Harrison scored in the Low Average range.

by Student 1, the District permitted Harrison and Student 1 to be in the same classroom, unsupervised, leaving Harrison vulnerable to attack.

28.     Harrison has suffered, and continues to suffer, physical, emotional, and psychological symptoms caused by the assault and its aftermath.

## V.     Claims Asserted

### COUNT I – CLAIMS BASED UPON SECTION 504

29.     Plaintiffs incorporate by reference all preceding paragraphs in this Complaint.

30.     Section 504 provides protections for students with disabilities by prohibiting discrimination against disabled/handicapped persons in federally funded programs such as public education. Section 504 and its regulations require the identification of all disabled children and the provision of appropriate educational services. 29 U.S.C. § 794; 34 C.F.R. §104.1 et seq.; see 20 U.S.C. § 1415; 34 C.F.R. §§ 104.36, 300.507, 300.510, 300.512.

31.     Section 504 provides that an aggrieved party has the right to bring a civil action for compensatory damages in federal district court. Chambers v. School Dist. of Philadelphia Bd. of Educ., 587 F.3d 176, 189, 197 (3d Cir. 2009).

32.     Where a free appropriate public education is at issue, the rights bestowed upon students and families by Section 504 are enforceable through administrative and judicial procedures, but neither compensatory damages nor attorneys' fees are available to plaintiffs at these administrative levels. 20 U.S.C. § 1415; 34 C.F.R. §§ 104.36, 300.507, 300.510, 300.512. However, where the relief sought is not for the denial of a free appropriate public education ("FAPE"), exhaustion of IDEA's administrative procedures is not required. Fry v. Napoleon Community Schools, 137 S.Ct. 743 (2017); W. B. v. Matula, 67 F.3d 484, 496 (3d Cir. 1995), abrogated on different grounds, A.W. v. Jersey City Public Schools, 486 F.3d 791 (3rd Cir. 2007) (same). Plaintiffs do not contend that FAPE was denied; that is not an issue in this case.

Under the authority of <u>Fry</u>, exhaustion of administrative remedies is not required in this matter, as only a claim for monetary damages is demanded; furthermore, there is no available administrative process by which exhaustion of claims for monetary damages can be adjudicated.

33.     A court may award monetary damages to an aggrieved parent or child with disabilities who brings a claim under Section 504 or the ADA. <u>Chambers</u>, 587 F.3d at 189; <u>Bucks County Dept. of Mental Health/Mental Retardation v. Commonwealth of Pennsylvania</u>, 379 F.3d 61, 68 n. 5 (3d Cir. 2004); <u>Matula</u>, 67 F.3d at 495. Recovery is available under Section 504 where entities charged with the care of persons with disabilities failed to properly provide or supervise that care, and physical injury resulted. <u>Enright v. Springfield Sch. Dist.</u>, 2007 WL 4570970 at *10-11 (E.D. Pa. Dec. 27, 2007) (affirming a jury verdict awarding monetary damages of $400,000 pursuant to Section 504 and ADA); <u>Susavage v. Bucks Cty. Intermediate Unit 22</u>, 2002 WL 109615 at *20 (E.D. Pa. 2002) (allowing a damage claim pursuant to Section 504 where a public agency allowed the improper use of an inappropriate harness for an orthopedically impaired, special-needs child). A plethora of other decisions fully support the availability of monetary damages under Section 504 and the ADA. <u>Chambers</u>, 587 F.3d at 189; <u>A.W. v. Jersey City Public Schools</u>, 486 F.3d 791, 804 (3d Cir. 2007) ("The remedies for violation of Section 504 are coextensive with the remedies available in a private cause of action brought under Title VI of the Civil Rights Act of 1964. These remedies include compensatory damages, injunctive relief. and other forms of relief traditionally available in suits for breach of contract.") (citations omitted)); <u>Jeremy H. v. Mount Lebanon School Dist.</u>, 95 F.3d 272,279 (3d Cir. 1996); <u>Matula</u>, 67 F.3d at 494 (partially abrogated on grounds other than Section 504 by <u>A.W.</u>) ("[P]laintiffs may seek monetary damages directly under § 504, based on the general presumption that all appropriate remedies are available unless Congress has expressly indicated

otherwise.") (internal quotations omitted); Neena S. ex rel. Robert S. v. School Dist. of Phila., 2008 WL 5273546 at *15 (E.D. Pa., Dec. 19, 2008) (Matula's holding regarding the availability of compensatory damages under Section 504 continues to be authoritative); Brandon V. v. Chichester Sch. Dist., 2007 WL 2155722 at *3 (E.D. Pa. July 25, 2007) (same); L.T. ex rel. B.T. v. Mansfield Township Sch. Dist., 2009 WL 737108 at *8 (D.N.J. March 17, 2009).

34.     Section 504 permits recovery of reasonable attorneys' fees by parents who are "prevailing parties" in an action or proceeding under those statutes. 29 U.S.C. § 794a (b).

35.     Harrison is disabled under Section 504 because he is a student with Post-Concussive Syndrome, Generalized Anxiety Disorder, Social Anxiety Disorder, PTSD, Major Depressive Disorder, and ADHD, which substantially limits one or more of his major life activities -- learning and his emotional well-being -- while he attended school in the District. Harrison was also otherwise qualified to participate in his program at the District.

36.     At all relevant times, the District received federal financial assistance from several sources.

37.     The District discriminated against Harrison on the basis of his disability, and denied him the equal benefits of his educational program, by failing to provide him with a safe, non-hostile, appropriate, and properly supervised educational program and environment where he would be free from harm, ultimately causing the assault described herein.

38.     The District had responsibility to ensure that Harrison's program and placement were safe, appropriate, and properly supervised.

39.     Harrison would not have been subjected to this assault if he had not been disabled.

40.     The District also caused Harrison further emotional trauma by failing to separate him from Student 1, despite the District's knowledge of Harrison's vulnerability to being attacked.

41.     Harrison was deprived of the equal benefits of his program, and otherwise subject to discrimination, because of his disabilities. The District acted in bad faith, used gross misjudgment, and/or was deliberately indifferent to Harrison's rights.

42.     As a result of these violations, Harrison suffered injuries and damages as described herein.

## COUNT II – CLAIMS BASED UPON THE ADA

43.     Plaintiffs incorporate by reference all preceding paragraphs in this Complaint.

44.     The ADA provides, in relevant part, that "no qualified individual with a disability shall, by reason of such disability, be excluded from participation in or be denied the benefits of the services, programs, or activities of a public entity, or be subjected to discrimination by any such entity." The Third Circuit has held that the ADA "extends the nondiscrimination rule . . . to services provided by any 'public entity' (without regard to whether the entity is a recipient of federal funds)." Jeremy H., 95 F.3d at 279.

45.     To prevail on a violation of the ADA, a plaintiff must allege and demonstrate that an individual (1) has a disability; (2) was otherwise qualified to participate in a school program; and (3) was denied the benefits of the program or was otherwise subject to discrimination because of her disability. See Adam C. v. Scranton School Dist., 2011 WL 4072756, at *7 (M.D. Pa. Sept. 13, 2011); Vicky M. v. Northeastern Educational Intermediate Unit, 2009 WL 4044711, at *6 (M.D. Pa. Nov. 20, 2009).

46.     The court in <u>Lamberson v. Pennsylvania</u>, 963 F. Supp.2d 400 (M.D. Pa. 2013)

discussed causation in a discrimination context under the ADA:

> Although the elements of a Title II ADA claim and a Section 504 RA claim
> are largely the same, there is a variation in the causation provisions of each statute.
> Specifically, the ADA precludes government discrimination "by reason of" an
> individual's disability while the RA prohibits such conduct "solely by reason of"
> an individual's disability. <u>See</u> 29 U.S.C. § 794(a); 42 U.S.C. § 12132. The
> omission of the word "solely" in the ADA indicates that Congress intended for this
> statute to have a less stringent causation requirement compared to Section 504. <u>See</u>
> <u>Maples v. Univ. of Tex. Med. Branch at Galveston</u>, 524 Fed. Appx. 93, 94 n. 2 (5th
> Cir. 2013).
>
> With respect to the ADA's less stringent causation requirement, the Third
> Circuit Court of Appeals has held that "the ADA's 'by reason of' language
> requires" the plaintiff to "demonstrate that, ***but for*** the failure to accommodate, he
> would not be deprived of the benefit he seeks." <u>Muhammad v. Court of Common</u>
> <u>Pleas of Allegheny Cnty.</u>, 483 Fed. Appx. 759, 764 (3d Cir. 2012). In fact, courts
> are prohibited from applying mixed-motive analysis in lieu of requiring the
> plaintiff to establish but-for causation unless the particular anti-discrimination
> statute permits otherwise. <u>Gross v. FBL Fin. Servs., Inc.</u>, 557 U.S. 167, 175-76
> (2009).

<u>Lamberson</u>, 963 F. Supp.2d at 412 (emphasis added). "The existence of an alternative cause ...

may not necessarily be fatal to an ADA claim so long as disability 'played a role in the ...

decisionmaking process and ... had a determinative effect on the outcome of that process.'" <u>New</u>

<u>Directions Treatment Servs. v. City of Reading</u>, 490 F.3d 293, 300 n. 4 (3d Cir. 2007) (reversing

the denial of summary judgment in favor of plaintiff in part because the District Court improperly

applied Section 504's sole causation requirement to plaintiff's ADA claim, which required only

"but for" causation).

47.     The ADA provides that an aggrieved party has the right to bring a civil action for

compensatory damages in federal district court. <u>Chambers</u>, 587 F.3d at 189, 197.

48.     Plaintiffs are not required to exhaust their administrative remedies with respect to

cases the gravamen of which is not FAPE and involving relief such as monetary damages that is

not available in administrative proceedings prior to bringing an action in federal district court. Fry; Patrick B., 2012 WL 1079127, at *4; Matula, 67 F.3d at 496.

49.     A court may award monetary damages to an aggrieved parent or child with disabilities who brings a claim under the ADA. Chambers, 587 F.3d at 189; Matula, 67 F.3d at 495; Bucks County, 379 F.3d at 68 n. 5; Patrick B., 2012 WL 3233036, at *4 ("compensatory damages, while not available under the IDEA, are available under . . . the ADA").

50.     The ADA permits recovery of reasonable attorneys' fees and costs by parents who are "prevailing parties" in an action or proceeding under those statutes. 42 U.S.C. § 12205.

51.     The District discriminated against Harrison by failing to provide him with a safe, appropriate, non-hostile, and properly supervised educational program and environment that was free from assault, ultimately causing the abuse, injuries, and damages described herein. The District's refusal to reasonably accommodate Harrison's disabilities permitted these incidents to occur. The District also caused Harrison further emotional trauma by failing to separate him from Student 1, despite the District's knowledge of Harrison's vulnerability to being attacked.

52.     Harrison was deprived of the equal benefits of his program, and otherwise subject to discrimination, because of his disability. The District acted in bad faith, used gross misjudgment, and/or was deliberately indifferent to Harrison's rights.

53.     As a result of these violations, Harrison suffered damages as described herein.

## COUNT III - NEGLIGENCE AND RECKLESSNESS

54.     Plaintiffs incorporate by reference all preceding paragraphs in this Complaint.

55.     The District owed a duty of care under Pennsylvania law to Harrison to ensure that his school environment was safe, appropriate, properly supervised and free from unreasonable and foreseeable risks of harm, and to refrain from taking unreasonable actions that

14

would cause damage or injury to him. The District assumed an affirmative duty to act on his behalf to protect him and knew that its inaction would lead to harm, given his vulnerability and the other known risks. Harrison and his family justifiably relied on the District to keep him safe and free from harm in school.

56.     Defendant breached its duty of care under Pennsylvania law to ensure that Harrison's program was safe, properly supervised at all times, and free from unreasonable risk of assault by other students and other foreseeable risks of harm.

57.     The District knew, at the latest, in February of 2019, that Harrison feared being attacked by Student 1, when Harrison's counselor reported it to the school. It also knew that Student 1 was posting direct and violent threats toward Harrison on social media.

58.     Despite this knowledge, the District breached its duties by failing to adequately supervise Student 1 to prevent him from assaulting Harrison

59.     The District breached its duties by failing to properly hire, employ, train, discipline and/or supervise its employees, including any involved in the assault described herein, and any staff, teachers, and administrators involved in any of the incidents involving Student 1, and any other students involved in similar episodes in which Harrison was victimized.

60.     The District employees who were supposed to supervise Harrison and Student 1 and keep them separated breached their duty to ensure that the classroom was a safe and secure environment for the students in it, including Harrison, by failing to heed the warnings of Harrison and his friends and family, and by failing to actually supervise and to take reasonable measures to ensure that students under their supervision were kept from engaging in acts of assault towards fellow students.

15

61.     As a direct and proximate result of the actions and inactions of District, Plaintiff Harrison has endured and will continue to endure severe physical, psychological and emotional suffering. Moreover, Plaintiff's risk of future concussions, and the risk of heightened severity of future concussions, are directly and substantially increased by the head injuries and concussion suffered as a result of Defendant's culpable actions.

62.     As a further direct and proximate result of the actions and inactions of District, Harrison has endured and will continue to suffer a loss of life's pleasures.

63.     The negligent, careless, and reckless conduct of the District constitutes extreme and outrageous conduct, which conduct was committed in willful, wanton, reckless and total disregard of the rights, safety, and well-being of Plaintiff Harrison, entitling Plaintiff to an award of both compensatory and punitive damages, and claims are made therefor.

64.     Moreover, the District's acts were ministerial, were taken in bad faith, were not in the public interest, and were actions of gross or wanton negligence.

## COUNT IV – CLAIMS BASED UPON 42 U.S.C. SECTION 1983 BASED ON STATE-CREATED DANGER

65.     Plaintiffs incorporate by reference all preceding paragraphs in this Complaint.

66.     Section 1983 imposes civil liability upon any person who, acting under color of state law deprives an individual of any rights, privileges, or immunities secured by the Constitution of laws of the United States. Shuman v. Penn Manor School Dist., 422 F.3d 141, 146 (3d Cir. 2005); K.S. v. School Dist. of Phila., 2007 WL 1009815 at *3 (E.D. Pa. 2007).

67.     At all relevant times, the District and its agents and/or officers were acting under color of state law.

68.     To prevail on a Section 1983 claim under a state-created danger theory, a plaintiff must plead and prove the following four elements: (1) the harm ultimately caused was

foreseeable and fairly direct; (2) a state actor acted with a degree of culpability that shocks the conscience; (3) a relationship between the state and the plaintiff existed such that the plaintiff was a foreseeable victim of the defendant's acts, or a member of a discrete class of persons subjected to the potential harm brought about by the state's actions, as opposed to a member of the public in general; and (4) a state actor affirmatively used his or her authority in a way that created a danger to the citizen or that rendered the citizen more vulnerable to danger than had the state not acted at all. Billingsley v. Franklin Area School Dist., 2012 WL 259992 at *5 (W.D. Pa. Jan. 27, 2012) (citing Bright v. Westmoreland County, 414 F.3d 276, 281 (3d Cir. 2006); K.S.S. v. Montgomery County Bd. of Commissioners, 871 F. Supp.2d 389, 399-400 (E.D. Pa. 2012).

69.     The District violated Harrison's Fourteenth Amendment right to bodily integrity by allowing and failing to prevent his assault by Student 1, a fellow student whom the District knew was likely to harm Harrison See L.R. v. School Dist. of Phila., 60 F. Supp.2d 584, 588 (E.D. Pa. 2014).

70.     The District's actions as described above in allowing Student 1 to be assigned to the same classroom after it knew of Student 1's threats against Harrison, and in permitting them to be present in the same classroom, without adult supervision or any other safeguards to prevent Student 1's assault of Harrison, after the District's employees discussed extensive plans to prevent such an assault, shock the conscience.

71.     The harm to Harrison was foreseeable and direct. Student 1's known and documented history of aggression and threats against Harrison rendered it eminently foreseeable that, if he were allowed to remain in the same class and same classroom without precautionary measures being taken, he would assault Harrison

72.     The actions of the District shock the conscience. The Defendant's actions placed Harrison in great danger of harm, with the certainty that assault by Student 1 would cause significant physical harm, emotional harm and trauma. The Defendant and its agents could readily have taken actions to prevent the harm to Harrison yet, shockingly, did nothing. Defendant's actions are especially egregious in that it had time to deliberate, formulate a plan, and implement it to protect Harrison after becoming aware of Student 1's threats against him – and, indeed, did deliberate and plan – but allowed Student 1 and Harrison to remain in the same class without reassigning Student 1, and further allowed both students to be present in the same classroom without any supervision whatsoever, directly ignoring its own plan. In thus ignoring the threat entirely, well after it had advance notice of the danger, the District was, at the least, deliberately indifferent. See K.S. v. School Dist. of Phila., 2007 WL 1009815 at *3 (E.D. Pa. 2007) (where deliberation was possible, and district officials could have acted with "unhurried judgment," showing of deliberate indifference was sufficient to satisfy the "shocks the conscience" prong of the state-created danger test; district's decision to allow a five-year old known sexually deviant boy to accompany female classmate through unmonitored area of school, resulting in her sexual assault by him, was, at the least, deliberately indifferent).

73.     Harrison was a foreseeable victim of Defendants' actions, because he was in a discrete group of identifiable students – a student threatened by Student 1.

74.     The District failed to implement policies that would have prevented the harm to Harrison from occurring.

75.     The decision to allow Student 1 and Harrison to remain in the same class, and same classroom without adequate supervision, was the result of official District policy and its exercise of its authority.

18

76.     Defendant's actions as described above directly caused Harrison's damages.

## COUNT V – LOSS OF CONSORTIUM

77.     Plaintiffs incorporate by reference all preceding paragraphs in this Complaint.

78.     At all times material to this Complaint, Constance Sorman has been Harrison's mother.

79.     Plaintiff Constance Sorman seeks redress for diminishment and denial of her right to the comfort, companionship and society (i.e., consortium) of Harrison as a consequence of the Defendant's failures to comply with federal and state law as referenced herein. The continuing symptoms and damage Harrison has suffered from these failures and the violations of federal and state law by the Defendant as further described herein, all occurred in violation of Section 504, the ADA and 42 U.S.C. Section 1983. McCurdy v. Dodd, 352 F.3d 820 (3d Cir. 2003). Plaintiff Constance Sorman has been, continues to be, and in the future will be deprived of the full comfort, companionship, society, and assistance and companionship of her son, all of which has been, continues to be, and in the future will be, to her great detriment and loss.

## VI.    Relief Requested

80.     Plaintiffs seek monetary damages and reasonable attorneys' fees and costs under Section 504 and the ADA; monetary damages and reasonable attorneys' fees and costs under Section 1983; and monetary and punitive damages under Pennsylvania law.

Respectfully submitted,

John W. Goldsborough
PA ID No. 73063

19

Jennifer P. Grobe
PA ID No. 323085
MCANDREWS, MEHALICK,
CONNOLLY, HULSE & RYAN P.C.
30 Cassatt Avenue
Berwyn, PA   19312
610-648-9300
Attorneys for Plaintiffs